The first case that we have this morning is Doe v. University of Denver. And we'll hear first, just one moment. Then we'll hear from the appellant. Ready? Okay. Good morning, Your Honors. My name is Phil Beiler from the South Millburg, representing plaintiff appellant John Doe, seeking reversal of the district court's dismissal on summary judgment of the complaint pleading Title IX, due process, and related state law claims. I want to begin by pointing out an opinion that came out over the summer in this very area. I happened to win it, but it was Seventh Circuit. I almost said justice. Judge Barrett wrote the opinion for the Seventh Circuit reversing what had been a dismissal of a Title IX due process claim. Doe v. Purdue, which is 928 Fed Third 652. Within five business days after today's argument, would you just submit a 28-J letter filed with the court under the letter form in compliance with our rules giving us that side? Absolutely. I've been busy and I'll be glad to do that because I think there's some points that are disruptive. One is, on due process, you need a real hearing. And that's something Purdue didn't provide. That's not something that Denver provided. And two, they adopted in upholding the Title IX claim, the language of the Second Circuit in Doe v. Columbia, which I also won, saying you can't be favoring complainants over respondents or that will support an inference of gender bias. Now I use that as a beginning because on the Title IX claim the issue is whether there was evidence of gender bias. In a way I'm frustrated because there clearly was. Now the erroneous outcome theory, which we proceed on and by the way, Title IX is on its face, as Justice Scalia would say, a non-discrimination statute. It doesn't say male, female, it says non-discrimination. But the erroneous outcome is if there's articulable doubt about the outcome, clearly there's evidence of that. In fact, I think it's very strong that it was a mistake. The second is whether gender bias is a motivating factor. I said a. It's not sole. A motivating factor in the erroneous findings. The reason why I point out the adoption of the language Doe v. Columbia has to do with the first of six reasons why the categories of proof. One is that the gender makeup of complainants respondents is, the norm is female complainant, male respondent. And what's more when I point out, and it's sometimes missed, is that this is what was to be expected because the Dear Colleague letter from 2011 said that we want universities to do this because of the problem of sexual assault in order to protect women. Women. That was the orientation. And while the district court says, well, gee, you know, they're responsible for the gender makeup of whose complainant respondents, that's not an answer. Because they are responsible for the fairness of their procedures. Well, I mean, how can they be responsible for the gender makeup? I mean, how is that even probative? Because they can't control, they're not soliciting complaints. At least there's no evidence of that. Well, yeah, well, they do. But beyond that. I mean, but we've got to live with your record in this case. I understand. Hold it. What I said is they are responsible for the fairness of the procedures. You can say, well, they're not responsible for who's making complaints. Actually, they are because they do encourage, one of the grounds is they do encourage the filing of reports. How is that in and of itself indicative of gender bias? Well, 2017, dear colleague's letter said you can't favor complainants over respondents. And Dovey Columbia said the same thing. I agree with that. But you're jumping ahead of me. Because I'm still back on the idea that they don't control who complains. I mean, it may be, I mean, do you agree with me that in this case it's not soliciting complaints? No, I don't agree. You don't agree with that? No, I have a whole section in my brief about they encourage the filing of reports. In your appeal brief? Appellate brief, yes. Well, tell me where I'm going to find that in the record, though. I mean, other than your argument that they're doing that. Tell me what the record says. Well, I mean, there's no question about that. The record sites are in that section of my brief about the encouragement of reporting. And the district court dealt with this issue, saying, gee, I don't understand why if you say, if you regret it later it's rape, I don't understand that. The short answer is, that goes too far. What you're saying is a male's going to be responsible for the subjective internal feelings of the female after the fact. It's not that there's just encouragement of reporting, which there was. It's the kind of encouragement. And that's another reason. And that's the second reason I had. The first reason is, you have a responsibility as a university for fairness of procedures. They didn't do that. And that's the Dear Colleague letter, that's Go V. Columbia. Third reason is, resources were only for complainants. Grove, at 351 in the record, admitted that the resources were only for complainants. Where in the record will we find the resources that were provided to this complainant and this respondent? The references are in the brief again, in terms of the resources. What it is, is that the district court Well, you may or may not remember the page, I'm not asking idly, because in your appeal brief, you referred to this, that there were unequal resources. Yes. But if I'm unless I'm mistaken, you never gave us an appendix site in the summary judgment record of what particular piece of paper or pieces of paper were provided to this complainant and respondent. Please let me finish. I'm sorry. And so I started at the first page of your appendix and went to the last and I overlooked it. I might have. Well, what the district court said and I do cite the district court opinion on this, is that the complainant and respondent were given the same list. The list is only for complainants. Grove, one of the Denver University people, at 351 of the record, admits that only complainants got resources. McAllister in her testimony is when she came on after June 1, 2015, which was after all this happened, that she instituted resources for respondents. There's no dispute on this record that the resources provided at the time this case was processed was only for complainants. Well, I mean, do you I have a little bit of a problem saying, well, they're unequal, but judges, I'm not going to tell you what... No, I'm not saying that. I'm saying that the resources... Can I ask you? Just do me a favor. I'm anxious to answer. I know, I know. But you don't know what to answer because I haven't asked it yet. So if you have an inequity and let's just say we know there's an inequity unless we know what this is and what this is, we really don't know whether or not that's enough to create an inference of gender bias unless we see the content. Inequity means a whole lot of different things in different contexts. What I refer to is what the district court said in terms of the list of resources, and that's provided by the acronym is CAPE. And CAPE only provides resources for complainants. Roe admitted that. So it really isn't... It's not unequal. It's like all complainant, zero for respondents at the time this case was processed. Okay, let me ask you a different question. I do want to follow up on Judge Carson's question. If you regret it, let's see, how does the phrase go? If you regret it, it's right. So in that, in district court, you did present that, but I didn't think you had presented that for this purpose, that the encouragement of self and indication of gender bias. I thought you were referring to that for a completely different purpose. Can you point us to anything in your summary judgment brief if you recall where you had argued that the encouragement of sexual assault complaints in itself is indicative of gender bias? Off the top of my head, no. However, since the district court dealt with it and I was structuring the appellate brief in terms of what the district court said, it was obviously presented to the district court. And he said, I don't understand why the statement, if you regret it, it's rape is a problem. Well, it is a problem. So I don't know how to answer you other than it was clearly there because the district court dealt with it. Well, the phrase was there. I just wonder if it was presented in this case. That was my understanding. And my time's getting short. This is a little more mundane. We couldn't find in the record where it indicated who put that sign up, whether it was students or the university. Do we know who put that sign up you refer to? If you regret it, it's rape reported? I have to ask. Because it could have been graffiti for all the record tells us. It wasn't graffiti. It was well known. The district court didn't treat it as graffiti. I'm a little frustrated because of time. Well, can I just tell you, and I'm going to give you an extra minute, but I do want you to understand that the three of us are going to decide your case and you may think our questions are irrelevant, but they're important to us. No, no, no. I think they're highly relevant. And if I had a whole hour, I would be glad to entertain. It's just that there's a number of points on the issue of gender bias. There's the bias training. There's the bias investigation. There's the severity of sanction. There, in short, are other reasons why cumulatively as a total matter of the evidence, there was a plethora of gender bias. And I might also add that if you can't say, as the district court said, well, I'm just not going to decide that motion with respect to Gruber, I think he did that because on the law, you have to because she's qualified. She's reliable sources. From 803 starts her affidavit in terms of why she's a proper expert. And quite frankly, she is. I'm sorry. In your summary judgment opposition brief in district court, did you submit an affidavit from Gruber or Gruber's report? Gruber's report. Also, there was reference in the brief to Gruber saying that there was one-sided determinations on credibility by the investigators. What? I'll give you an extra minute and a half because I'm going to take up another 30 minutes. I just want to ask you a question. I know. So why isn't Gruber's report hearsay? She's an expert. It's expert testimony. That's what it was being submitted for. So can you identify anything in Rule 801 or Rule 802 that says that typically reports are not admitted, A, because they're hearsay and B, because they're cumulative, at least at a trial. An attorney put in the evidence and included the Gruber extra report. I also want to say that there was a motion to preclude at the same time, roughly the same time as summary judgment and all the issues about the meaning of Gruber's opinion, which was to explain for the existence of the prior effect, the workings of gender bias in the Title IX process, that was all at the same time as summary judgment. So it was clearly before the district court in terms of the importance of Gruber, because if you accept Gruber's opinion and her analysis of the record, and she went to the record and she referred to their colleague letter and the like, there's no question that there's evidence before the court in terms of gender bias. Gender bias, I think, was most strongly proven, actually, by the evidence of bias training in terms of believing that campus rape is epidemic. You had trauma to rationalize away inconsistencies in the complainant's stories, to impugn the motive to lie to the male. All these played out in the investigation that was biased, because there was a persistent, you know, let's credit the complainant, even though totally inconsistent, sorry. And look, the facts here are important. This sexual encounter, times, you know, one night in October of 2014, 8-9, it's not until April 15, her boyfriend reports it, in April 15 of the following year, that's six months. And so it calls into question, you know, what's going on here. And the story which Jane Doe gave changed from what she told the resident director, to what she first said to the investigators, to what she then said, you know, a month later to the investigators. Whereas John Doe's story was very consistent. In short, the workings, and Ruber explains this well, but you don't need Ruber for it, the investigation, investigators, this was an investigative model. You don't have a hearing. So what they say and what they think is key. And they determine that, you know, she has to believe he's not, notwithstanding the inconsistencies, they impugn his motive to lie, which there was no real basis for. You need to wrap up. You're 19 seconds over, you need to wrap up, please. Okay. I just, I didn't get to state action, and I did brief that. All I want to say on that is that argument we made, in my appellate brief, quoting the Brentwood factors, and then explaining on page 49 over to 50, how they all together support state action here, was in the... I promise you we've read your brief. Okay. It's in the record. Excuse me, sir. Now you're 54 seconds over. Okay. I'm trying to ask you kindly, you're over time. I thought you said you'd give me another minute. I'm sorry. You've already taken your extra minute and 30 seconds. I'm at one ten right now. When the red dot comes on, and this is so all counsel will know, when the red dot comes on, that means your time has come to a close. Sir, I've already given you a minute and 30 seconds. My deputy clerk has heard that. She added time. I'm sorry. So now you're a minute and 30 seconds over. In addition to my minute and 30 seconds. I'm sorry. I misunderstood there. I apologize. I didn't mean any disrespect. I understand. And I have plenty to tell you. That's the problem. Okay. I'll have to stand on my briefs at this point. Thank you, sir. We'll hear from the appellate. Thank you. May it please the court. Jim Gall on behalf of the University of Denver and the appellees in the case. On the Title IX claim, the district court correctly concluded that there was no evidence that would create an inference that John Doe suffered discrimination on the case. Mr. Viola has argued at length that DU's investigative process was flawed, but it was under that process that John Doe was interviewed twice and was allowed to have his personal lawyer present, a privilege that Jane Doe did not have when she was interviewed. Could she have had a lawyer if she asked for one? She could have. Okay. So the fact that she, that really, I mean, the fact that she didn't have one really doesn't do anything for your argument, right? But it does show that John Doe had something extra that she didn't have because he was able to do so. He was able to afford that. But putting that aside, it was also under the same process that John Doe was able, along with Jane Doe, equally, both of them had the right to examine and review their statements and to provide edits, which John Doe did. John Doe also had full access to his preliminary report, which contains all the witness statements, and was able to comment on those statements, as well as the final report, which lays out the rationale and the conclusions and findings of the investigators. And of course, he also had the right to appeal under that process. This is not an anti-male process. John simply disagrees with the findings and the outcome of this case. Now, under the erroneous standard theory, John has to do more than just say, D.U. got it wrong. He has to show that D.U. got it wrong because anti-male bias was a motivating factor. And the district court correctly focused on this second prong. And under the standard, John Doe has to show, one, that D.U. got it wrong, that he was wrongly using these policies, but more importantly, two, that the decision was linked to an anti-male bias. And there, there was no evidence of that bias. Does the weight of the evidence uncovered by the investigation matter, in your opinion? The weight of the evidence matters in terms of supporting the investigators' findings and conclusions. Well, let me ask you, I mean, can the weight of the evidence, let's assume that the plaintiff is right, that the weight of the evidence in the investigation favored the plaintiff and not the complainant. Can that, in and of itself, be evidence of bias if the university ruled for the complainant? Well, that could lead to a conclusion that that was actually gender bias. It could be a bias in favor of complainants. And so, we go around again. What we have here, at the core of all the arguments, is this notion that in the vast majority of cases, complainants are female and respondents are male. And because of that reality, any policy on sexual assault on campus must necessarily have a disproportionate effect on men, simply because more men than women are accused of sexual misconduct. Well, just hypothetically, if 100% of the complainants are female, and 100% of the respondents are male, then would that change the complexion of your response to Judge Carson? It would not. In that case, you could say, well, theoretically, that it's not a bias in favor of females, but the reality in that situation is, everyone would know that all of the complainants are female. And that's the essence of the disparate impact theory. That's the theory that they're actually proceeding on. What's wrong with the logic of that theory if, in this scenario, all of the complainants are female? If, in your hypothetical, in every case, males are respondents and females are men, any rule pertaining to sexual assault would have this disproportionate effect on men. If it favors that category. Correct. But it does not mean that there was intentional discrimination. It's talking about disparate impact theory. That's the essence of the theory, which is that men, as opposed to women, suffer a disproportionate effect based on these policies. The essence of the disparate impact theory is that there is a facially neutral policy that disproportionately affects members of a certain protected class. Now, they point to 35 cases in a five-year period at DU and point out that, in all those cases, the men were respondents. True. And in all those cases, all but one are female. What they fail to point out is that in five of those cases, almost 15% of those cases where women accused men, there was a finding of no responsibility, a finding in favor of the men. At the end of the day, all their arguments boil down to this concept. This disparate impact theory. And there are two problems there. One, they never pled a disparate impact claim. And understandably so, because disparate impact is not cognizable under Title IX. Let's look at some of the arguments that Mr. Byler raised. They talk about how DU employed a victim-centric investigation approach in referring to complainants as survivors and victims, not in the course of the investigation, but in some training materials on campus. And they argue that this is anti-male. Well, this is not indicative of anti-male bias, because a survivor or a victim can be either male or female. They talk about fewer resources, and Mr. Byler just mentioned this morning that resources were only available for complainants. And that is not accurate. Do we have the actual documents in the summary judgment record that were supplied to the complainant and the respondent? Yes, the list is in the appendix. Not the list, the actual documents. I'm sorry, I don't understand. Well, what was supplied to them? That's what I'm confused about. I thought it was that somebody supplied the complainant with something, and somebody maybe supplied the respondents with something. No, they're talking about services available on campus for complainants versus respondents. And the only point to one thing, and one thing alone, is CAPE, the Center for Advocacy and Prevention and Empowerment. There is no argument here that both respondents and complainants can avail themselves of all of the services, including the health and counseling services, and the chaplain services. But in one regard only, there is a service that is intended only for complainants or those who are alleged to have suffered sexual assault or sexual trauma, and that is CAPE. While it is true that CAPE is intended to provide services to complainants, that doesn't create an inference of bias, because there is no evidence that female complainants receive CAPE services, but male complainants do not. There is no evidence that female respondents receive CAPE services, but male respondents do not. I mean, there is evidence of that. I mean, from a practical standpoint, though, because virtually all the complainants are female. So there you, that, that, CAPE does not have a lot of men coming in for services when this happens. That is certainly true, but it's not exclusively for females. It's for complainants, male or female. But the reality is, yes, you're right, Your Honor, I agree that more women than men would utilize those services. So do you think that if we looked at this case sort of under, like a, through an equal protection lens, that the fact that you have a facially neutral investigatory policy that is impacting basically men only, that that could be direct evidence of discrimination? No, because of the two vastly different concepts. One is disparate impact with no intention of inflicting discrimination. What if there is this impact plus some other evidence of bias or discriminatory intent against men? Under Title IX jurisprudence, that's not a cognizable claim because the standard there is there must be a showing of intentional discrimination. And that's the problem with Yeah, and I guess my question is can't this impact evidence I mean aside from a discriminatory, or a disparate impact analysis, can't this evidence be a portion of the evidence used to show a discriminatory intent? It wouldn't be, you certainly wouldn't just be able to rely on the fact that only males are respondents generally, but that plus something else, can't that give the plaintiff some evidence of gender bias or discrimination? I would submit that it would, but only in the context of Judge Baccarat's hypothetical where all men are respondents and all women are complainants. When you have a mix, when there is this reality that men can be victims of sexual assault, whether it's, and it's usually in the context of men against men, those encounters, but that's a reality and because they can be and they are victims of sexual assault, disparate impact is not available to prove intentional discrimination. The two different concepts. On the encouragement of reporting, yes it is true that DU encourages the reporting of sexual assault on campus, but they point only to this poster that says if you regret it, it is rape. Now first, there is no evidence that such a poster ever existed, much less evidence that DU endorsed such a poster. How did that get on the record? It got on the record because of this vague testimony in John Doe's deposition where he said, and I quote, if I recall correctly, I believe I saw a poster. And from this very vague testimony, they claimed that DU had encouraged women, not men, to file sexual assault complaints against men. This record actually concluded that regardless of whether this poster existed, its message was gender neutral because both men and women can regret having sexual encounters. And again, there is no inference of gender. Does it make a difference that it's linked with the word rape? Was there any evidence about the generally understood meaning of rape being gender, that is being female? There is no evidence in the record that suggests that rape is exclusively something that happens to women. About how the community perceived the term rape? There's no evidence in the record if that's what Your Honor is asking. It's not in the record. It's just this supposed poster that came out of nowhere and through the benefit of discovery, it was never uncovered. Literally, where did the poster come in? Somebody apparently put on evidence that there was a poster. Correct. In the vague testimony that I just mentioned, there is no poster, per se, that's in the record. This poster was never found. This poster never existed from our standpoint. And there's also nothing in the record that says where this poster was, who its intended audience was, who put it up, whether it was graffiti, as Your Honor pointed out. None of that evidence is in the record. But given the fact that we're here on the review of a summary judgment ruling, don't we have to view all of the reasonable inferences in favor of the plaintiff starting with the assumption that he did have personal knowledge of the poster? Now granted, the testimony was vague, but the district court didn't, in ruling on summary judgment, exclude it under Rule 601. He went on to address the merits of it. So all of these ambiguities or uncertainties, don't they have to be viewed in favor of the plaintiff? Yes, they do, and the district court did so. The district court assumed that the poster existed, but said that the message was gender neutral, that it doesn't create an inference of bias against males. So why isn't that an inference that it is gender neutral, that the district judge should have viewed that inference also in favor of the plaintiff and taken it, particularly in light of the fact that rape is usually committed against females, that this was indicative of a gender bias? Why isn't that an inference that he was improperly drawn in favor of the movement? Because that was not what the supposed poster said. There was no gender element to the message, other than some connotation that perhaps rape only happens to women, which we know is not true. And one final word on the Dear Colleague letter. They claim that that's the root of all evil, and from a small reference to this statistic that one out of five women suffer sexual assault on campus, they extrapolate from that and say that that shows anti-male bias. That shows that the Dear Colleague letter was intended to protect women against men. But they've ignored the very next sentence that says in the letter that approximately 6.1% of males were victims of completed or attempted sexual assault during college. And they also ignore the explicit directive in the letter that says Title IX investigations must be prompt, thorough, and impartial and that complainants and respondents must be treated equally. That's in the letter. I see that I'm out of time. Thank you. Can we give him just a little more time for parody? Oh, absolutely. I was going to do that anyway. Thank you very much, Counsel. Oh, no, I wanted this Counsel. Because he didn't have enough time and I have one more question. I'm just trying to be okay. I do want to alert Phillips Counsel. I'm going to give you two minutes for rebuttal. I just wanted to make sure you had parody so you could answer another question or two. So your opposing Counsel mentioned the Purdue case that Judge Barrett authored. Are you familiar with that case? I am not. They have not submitted supplemental authority on that. I'm going to represent to you that in that case there was a problem the court noted with the statements being prepared by the University, at least the complainant statement being prepared by the University and the University not just taking a statement and just letting what the person's words were stand for themselves. I just want to know and you're not familiar with the case so it's probably springing this on you. Do you think that's an issue with your case that your investigators wrote out these back for comment as opposed to just taking the statements from the witnesses and letting their own words stand? The way the investigation model works at DU is that the investigators take down the statements of the witnesses as verbatim as they can and then give it back to the witnesses, whether it's complainant or respondent or other witnesses, to review and to edit as they saw fit. And so there is this collaborative process. At the end of the day the witness or the respondent or complainant will own that statement. They must be satisfied with that statement that it is accurate. Right. But isn't it also the case in this instance that the investigators drew inferences about credibility based on what people said were or were not accurate about their statements? That is true. Okay. Do you think that's problematic for your case? No, because I think that's a very inherent duty of investigators to be able to make those credibility determinations. Okay. Thanks. Thank you. Thank you very much. As I said, I'll give you two additional minutes. I have to smile because I do appreciate it. It's always frustrating as an advocate. There's so much you want to say. I totally understand. And all your questions are on point. I'm in fact impressed with, you know, your knowledge of the record. One point I wanted to drive home, which I started out with, is the responsibility of the university is for fair procedures. And the record is the 2017 Dear Colleague letter, 631 or 632 etc. That's one reason they filled the 2011 Dear Colleague letter. And the point is that the Dear Colleague letter in 2017 recognized the need for complainants, for procedures not to favor complainants over respondents. This has been a problem, not only in this case, but throughout the country. Because, you know, obviously I've been doing all this. I just see same old, same old in all these cases. And that's one of your the extent of pointing out why it's just not the gender makeup per se, although it's there, it's the reality. Also the Dear Colleague letter contemplates women being protected. By the way, it is in the record in Gruber's articles about this 1 in 5 being false. She puts it as 6 in 1,000. That's very different from 200 in 1,000. I had put it .03.  The ideology of the Title IX people is that campus rape is epidemic. That's why you have reduced procedures. There's been a move back. Betsy DeVos' speech, which I do quote, is wonderful, but we have in the record the Dear Colleague letter saying you've got to have fair procedures. And that was the point in Dovey, Columbia that was picked up by Dovey, Purdue. I know because I quoted it in my brief and I quoted it in my oral argument to the Seventh Circuit. The one last point real quickly is the summary judgment motion was heard about the same time as the motion preclude. In effect, because of the consequences of accepting Gruber that you have terrible issues on gender bias, it was supplementary briefing on summary judgment. In effect, Gruber gave a declaration there starting at 8.03. It's a wonderful explanation of why she gives proper expert testimony, and I unfortunately am out of time again. Thank you, Your Honor, and thank you very much. It was very well presented in your briefing and in your arguments today. Thank you, both counsel, for your hard work and excellent advocacy. This matter will be submitted.